Case number 15-5089, Via Christi Hospitals Wichita, Inc., a successor to St. Francis Regional Medical Center appellant v. Sylvia Matthews Burwell, a Secretary of Health and Human Services. Mr. Mazur for the appellant and Ms. Labashin for the appellate. Mr. Mazur for the appellant and Ms. Labashin for the appellant and Ms. Labashin for the appellant. Mr. Mazur for the I'm way behind you, I'm sorry Mr. Mazur. I was under the impression from what the program memorandum says, and I'm looking at Joint Appendix 1033, Example 3, that actually what the program memorandum says is that liabilities are assumed, no other consideration is exchanged. The sales prices assumed liabilities are allocated first to the cash, cash equivalents and other current assets. Isn't that the inverse of what you're saying? No, that's not what the government did. The government went way beyond that. You know, it took the consideration and allocated the cash, cash equivalents and other current assets were only $116 million. So that would have left $215 less $116, about $99 million. The government allocated the consideration to everything other than the property, plant and equipment, and then said, voila there's nothing left for the property, plant and equipment and depreciable assets. So I agree with you. Is there a category in between? I may be missing something here. I thought the cash, cash equivalents and other current assets together with depreciable assets was the, that's the whole ballpark, but I'm missing something. I believe that this, that it's fairly intended that you take the, under the program memorandum, you take the total consideration and you subtract the cash and the cash equivalents and other current assets, and you take that right off the top. And then you compare it with, you know, and then you see if there's anything left for the depreciable assets and other assets. But that's not just what they did. They took out the cash, they took out the current assets, they took out everything, you know, and then said there's nothing left for the depreciable assets. So there's virtually, there's nothing in this program memorandum with which I agree. I think all of it is contrary to the regulations and even contrary to the provider reimbursement manual. But here they're not even following the program memorandum. They're going way beyond that in coming and trying to reach a conclusion that zero money was paid for the depreciable assets. I'm just, I'm sorry. I'm sorry. So maybe if my colleagues get this, I don't have to hammer on it. But if the non-depreciable assets were $222 million. I'm sorry. $222 million? The total assets. Non-depreciable assets. I think that's your figure. And then the liabilities are $214 million or perhaps less. But that's a high number. So that's a high number of what compensation was received. You don't end up with a big difference there to go to compensation for depreciable assets, which is the issue that we're focusing on. Now, all of the assets together were worth $219 million. That's what valuation counselors determined. The consideration, the total consideration was $215 million. So we've only got a $4 million difference between the liabilities assumed, which is the consideration received for the assets, and what valuation counselors determined to be the value of the assets. You know, 2%, 98 cents on the dollar, however you want to characterize it. But it is certainly not a significant gap, which the CMS program memorandum says if, in fact, there's a significant disparity that may indicate a loss, indicate that it's not a bona fide. It certainly doesn't mean that that's not reasonable consideration when you're getting 98 cents on the dollar, particularly when you have a consolidation as opposed to a straight asset sale where it's really not a number that can be easily negotiated. The consideration is the liabilities that go over, and the fact that although this Court has rejected this analysis to fill big gaps, when you take a consolidation, you take all the assets, all the liabilities, known and unknown. So although there were only, whatever, $215 million or $212 million in known liabilities, it certainly is something that would be reasonable to think that there's some other things lurking in the background that could very well eat up the 2%. So we think that there hasn't been a case, this Court hasn't seen a case where, in fact, the liabilities, the consideration, and the value of the assets are just so close. And the only way that they're not close is if the government relies on reproduction costs instead of the valuation on the income approach, which is sort of a, with all its failings, the income approach is universally used for gauging the fair market value of these types of hospital assets. Of the whole package, but not of depreciable assets as a separate category. I mean, there's a lot of difficulty with that precisely because the assets can't really be desegregated, isn't it? I mean, the Secretary has long recognized that, and we've accepted that in other cases. Yes. The income, well, the income approach includes, it comes with a number that includes a bundle of assets that does, in this case, include working capital. And I realize it wasn't so clear in the other case where the language was different, but the language on JA 833 and 834, the appraisal, shows it very clear that the $89 million includes working capital of $58 million and fixed assets of $30 million. And I will apologize, or not apologize, but 834 is not a very good copy. You can't tell whether it says including or excluding on that second line, but we have a better sheet of paper that where, and we provided that to the government counsel very recently, that the value was estimated at $89 million, including working capital of $58 million. Would you like to submit a copy to the clerk's office so the Court has a better copy, too? Yes, we would, Your Honor. Thank you. I'd like to ask you a question about the overall background of this. You argue that the Via Christi itself does not, its costs for Medicare purposes do not include anything, is that correct, for the value of these assets? No. In other words, it will get no depreciation. It cannot demand, cannot ask for compensation for depreciation on these buildings, is that correct? Well, we haven't made that statement, but that is essentially true because of the prospective payment system that went into effect, that generally depreciation is no longer recognized as a general cost of Medicare. I see. Depreciation doesn't count anyway. Right. Aha. Okay. Okay. Take your point. Okay. Your Honor, I'd like to reserve what remaining time I have. Thank you. Let me just ask one more question. Are the procedural challenges that you make to the application of the bona fide sales rule? Sorry, Your Honor. I'm just having a little trouble hearing you. I know. It sounds loud to me up here, but I gather I'm not using the microphone effectively. The procedural challenges that you raise to the application of the bona fide sales rule, are any of those different from the ones that we considered in the St. Luke case? The arguments are the same, but they're now applied to rules that are in, strictly in the program memorandum. They're not in the bona fide sale provider reimbursement manual. The provider reimbursement manual says it must be a bona fide sale, including reasonable consideration. The Court has rejected that argument, including all of the related procedural arguments why it should not be a bona fide sale or not reasonable consideration. This Court has not addressed the requirements that are exclusively in the program memorandum that says that you must go out and try to maximize consideration even if you've obtained fair market value compensation. Are there, what would you point to as facts that show that they did seek to maximize consideration other than the amount of compensation itself? Structurally, is there anything? It doesn't seem There's really, the record does not show that they went out and put this thing for sale for the highest bidder. The record shows that there really was nobody out there that would buy I'm just saying, is there anything you can point to structurally? Even if you don't have a market, let's say St. Francis wanted to get as much cash out of this exchange as it could and go off and do its work elsewhere, that would be something you could point to that would give St. Francis an interest in achieving the highest value. But that's not the position that St. Francis was in in this case. And so I'm just asking you for any other circumstances, factors, incentives that you can point to that would make us think that it did have an interest in getting a fair market value for its depreciable assets. The only thing that I can say is that given the marketplace and what was happening, St. Francis was very concerned about its long-term viability, that whether it could stand alone and maintain itself. Right. So it was going into the red and it wanted to stop hemorrhaging, which is the situation of a lot of health care facilities. Thank you, Your Honor. Good morning. May it please the Court. Deborah Labosheen on behalf of the Secretary of Health and Human Services. As the Court has clearly been asking questions of Mr. Mazur, I do not want to take too much of your time going over the long history that this Court has established as to the reasonableness of the Secretary's interpretation of her regulations. I believe that the Court has accurately zoned in on the sufficiency of the evidence that the Secretary based her determination that there was no reasonable consideration in this case. Going off of Judge Pillard's questioning, I think it is evident from the loss calculations that V.A. Christie submitted in the underlying administrative case that, in fact, all of the assets other than the plant property and equipment of St. Francis were transferred, consolidated with St. Joseph's to create V.A. Christie. And those assets were valued at almost $222 million. And, again, these are the figures that St. Francis and V.A. Christie put forth themselves. And these were the fair market values of their assets. And is that JA-2239? Is that where you would look at that table? It may be there, Your Honor. The iteration I'm looking at is JA-1065. That is the value of non-depreciable? Non-depreciable assets and also excluding land. And that's the $222 million figure. Comparing that figure to the consideration that, again, St. Francis in this computation was using was the consideration of $215 million. So therefore, you know, evaluating those two amounts, it's clear that all assets other than the depreciable assets and land were consolidated for less than the value than the assets value. As the administrator found in the lower court considered, was that this means that those assets were transferred for less than their full value and that there was no compensation left attributable to the depreciable assets or the land. The depreciable cost of the depreciable assets transferred was what? It depends on what numbers we use. If we use the reproduction cost determined. Oh, I see. Oh. The net book value, you know, the net book value I think was $148 million. And the, yes, the property and equipment was $148 million as the net book values kept on the hospital's audit. But even under the income approach, isn't it 89 million according to what the number that Via Christi would put forward? And so you would say, well, put 89 next to the whatever it is, minus 7 million  No, Your Honor. On the $89 million that the appraisal valued, that was for the going concern of the hospital. So it wasn't just the depreciable assets. It was. That was the income approach? The going concern of the entire hospital. Of the entire hospital was $89 million, but to that was added limited use and investment assets and other non-operating assets, which totals the $219 million that Mr. Mazur was referencing. So using the income approach, the total amount that the hospital is valued at is $219 million, of which $89 million of that was the going concern. And what is the under the income approach? Was that the $28 million? What's the under the income approach, the depreciable assets? The depreciable assets under the income approach was determined as being about $31 million, $30.5 million. But interestingly, the only way that that number is arrived at is by backing out of the $89 million, $58 million in networking capital, which itself, from the appraisal and the documents that the hospital produced itself, suggests is somewhat of an arbitrary number, because $33 million of consideration was used immediately to offset current assets. So arriving at the $39 million of depreciable assets under the income method is fairly arbitrary, because of that $89 million, $58 million of it was considered networking capital, which was, did not include all of the current assets that were on the books of the hospital at the time. Can I just explore with you how all this fits in with Medicare's reimbursement? Mr. Mazur was saying that going forward, this doesn't affect, or the way it's treated doesn't affect reimbursement for via Chris Day. Correct. I mean, there's two things that are going, or a couple things that are going on. Obviously, Congress changed the loss calculation as, you know, post-1997. This transaction happened before that. The other, as of 2001, depreciation to the extent it is a reimbursable cost of any hospital is factored into the capital prospective payment system. So to the extent that via Christie acquired St. Francis' assets in this consolidation, those assets were put on via Christie's books at the net book value that they had existed on St. Francis' books. So to the extent that I see, and that's a component for the compensation scheme. Correct. Okay. So I'm understanding it then. Well, there's a loss, obviously, which has occurred. But that loss, if it's ever realized by sale or something, would be recouped. Right? It would be recouped by via Christie? No. I mean, I would disagree with the premise that there's been a loss here. There has not been any, you know, via Christie has not demonstrated to the Secretary's satisfaction, and her determination's obviously been upheld by the lower court, that there was not a loss compensable by recompense. It's not a realized loss. It's not a realized loss. Right, right. And I understand your position on that. But there's a loss of value. I don't know how one draws that conclusion. I can't. The Secretary has not drawn that. I mean, from via Christie's perspective, to the extent that there was a loss of value suffered by St. Francis over time that was steeper than the default recognition of depreciation by the government, that actually benefited via Christie at the point that it absorbed St. Francis, right, because it got a deal, didn't it? It got the assets. It got the assets that it got. To the extent that it was cheaply, I will note that the consolidation of the two hospitals into via Christie, all of the assets from both components were brought into via Christie's books at the same, there was, all the assets were just pooled. So there was no loss. And you're saying they have the same net book value that they had for St. Francis at the outset. Correct. So the net book values of these depreciable assets that were on St. Francis's books are now the same as they are on via Christie's. And to the extent that depreciation of those assets continued to be reimbursed by Medicare for the years until PPS came into existence, depreciation, according to the useful life, you know, the depreciation schedule continued with via Christie's. So there were no worsening. Where in the joint appendix do we find this, or is that? That is a good question, Your Honor. I am not sure I can point to where via Christie's joint, it is in the appendix, the joint, the audited financials for the, I think the 96 and 97 are in the joint appendix. Okay. I apologize for not having that at my fingertips. I will note, however, and I can provide that citation for you, my recollection is, however, that it won't be possible to see from that audited financial statement of via Christie what the division of the assets from the two hospitals were. So to the extent that there is a line item for the net value of the depreciable assets held by via Christie. But it is produced by simply putting together the book value of both hospitals' assets. Correct. But we are not going to see it on via Christie's accounting, which corresponds to which. Correct. You would just see the pooled assets of depreciable, PP&E at the net book value. I am not aware of whether there is anywhere in the record that demonstrates that breakout. What is your response to Mr. Mazur's arguments that requiring in the nonprofit consolidation context that the transaction be arm's length just doesn't make any sense? I mean, I would argue as this Court has done and the lower courts in St. Luke's and in Forsyth as well, as did the Tenth Circuit in via Christie when looking at the other side of this transaction, that the evidence of an arm's length negotiation is probably more important in a nonprofit merger and consolidation than in a for-profit company. That being because the nonprofit, by virtue of not being a profit-maximizing entity, has less, the consideration that received is much less indicative of the fair market value of the assets, whereas the attempt to seek out the best value for the assets as one can, which is demonstrated through arm's length negotiations, putting your assets up for sale, getting a pre-transaction appraisal, doing these, taking these steps to understand what your assets are and then going out and trying to achieve maximum value for your assets demonstrates that in fact the assets may be worth more or less than what the net book value is. But in this circumstance, that didn't happen. The only indication of a value that the hospitals put forth is a post hoc valuation. Clearly the assumption of one's liabilities has no rational connection to the value of the assets, which is why the Secretary, we sort of reasonably found that there was no reasonable consideration here, because the consideration received was so much less than the net book value of the assets. Could I go back to the prospective payment system? I gather what you say, that it is tailored to each hospital, right? In other words, it's not, as in rate caps, another field we look at from time to time, it's not based on an estimate of costs across the system. Is that right? That is, as a general matter, and I don't know the intricacies of the PPS system and in this circumstance, capital PPS is even different than the standard inpatient or outpatient PPS systems. It, too, is its own body of regulation. I'm sorry, which is its own? So my understanding in the current payment under Part A, there is inpatient prospective payment system, there's the outpatient prospective payment system, and then there's capital prospective payment system, which is aimed at reimbursing hospitals and other providers for their capital investments that may not be properly captured. And that, at least you're saying, is individual to a hospital? I don't know that I can take that position, Your Honor. I don't disagree. I'm just not well enough informed. But it is my understanding. That seemed to be implicit in your answer when you said that the book value going over to Via Christi would be a basis for calculating its reimbursable costs. It is, to the extent, right, to the extent that every hospital has, is reimbursed currently for capital expenses prospectively and not based on its reasonable costs that it would demonstrate through a cost report. And there is, depreciation is worked into that, just kind of in a more standard way, and what we're dealing with here is whether that should be corrected based on a transaction. Correct. Prior to 1997, it was hospital specific, and you showed that a hospital You could correct based on an actual transaction in the world, but the idea that that transaction might more accurately reflect the value of depreciable assets. Exactly. And therefore, depreciation than the presumptive rate. Which is established when the asset is acquired and put on your books and depreciated either through a straight line method or some other method which So they're still getting depreciation, they're just not getting a correction to it that they want if the Secretary's position holds. Correct. Anything further? No, nothing from me. All right, thank you, Your Honor. Counsel for appellants. Your Honor, just a very few points that I would like to make. We disagree with the thought that an arm's length transaction means going out and getting every penny that you can get for an asset. But what about, Mr. Basar, the idea that even caring enough to get a valuation, to get an appraisal of the value of those assets as you go into the transaction, that would be a way, even in the absence of an active market for the assets of St. Luke's, that might have manifest some arm's lengthness? Your Honor, with due respect, if there are no buyers out there besides a consolidation with St. Joseph, it wouldn't matter. Well, you might think, are we going to stay doing what we're doing, or are we going to take this deal? You still have a choice. But the record, yeah, but the record does demonstrate the testimony that they had a pretty good idea what the facility was worth based on the prior anticipated cash flow, and there's testimony of that at 281. So it wasn't that they were completely in the dark. I also, can you tell me, when you talk about current assets, are you including non-PPP assets other than cash and cash equivalents? When we had our exchange before about numbers, I was not entirely following your Let me refer you, Your Honor, to Joint Appendix 685, which is one of the balance sheets, and it's easy to look at because it has a category specifically referred to as current assets. And it lists those assets that are part of current assets, cash and cash equivalents, short-term investments, assets as use as limited, supplies, prepaid expenses, comes out at $116 million and $577,000. It does not include another set of monetary assets that are held by bond trustees or limited use, which is that next category of assets as use as limited. Obviously, it doesn't include property, plant and equipment, and then it doesn't include this unamortized financing costs and other non-current assets. So when the Secretary argued that when you assign all these assets, all of the consideration of these assets, there's nothing left for the principal equipment, it not only has used the current assets of $116 million, it used the assets as use as limited for another $86 million, the unamortized financing costs of $19 million, and then said, gee, look, there's nothing left for depreciable assets. And that's not the way it's supposed to go. I also don't know. Why would you, though, count assets whose use is limited as zero, which it sounds like you're doing? I'm sorry, Your Honor. One more time, please. I didn't hear. Assets whose use is limited. It sounds like you're counting those as zero. Well, no, they were counting them as if they were regular cash. They were putting them I'm asking you how you are treating them. Oh, no, they certainly have a value. I'm just saying that that's not part of the test. And even if you include those, again, starting with $215 million, if you take away the current assets of $116 million, you know, you've got roughly 99, you take care of the assets whose use is limited. You subtract that, another $84 million, you still have about $15 million attributable to depreciable assets. It doesn't come out until zero until you start putting other things in there, such as this unamortized financing cost of $19 million at the very bottom. That's what, you know, that and other things is what leads them to the, you know, that the depreciable assets were provided as a freebie. I also wanted to note that they said that arm's-length transaction does not mean actively trying to get every penny, particularly when they, you know, the arm's-length transaction suggests a maximized consideration. Well, here what they got was a reasonable consideration as determined by an appraiser, and the board noted that an appraisal was a third party's attempt to derive the price that arm's-length bargaining should produce, and that's at $197, $198. So there's no reason to believe that even if there was a purchaser out there that was willing to purchase it, that they would get any more than the appraised value of the $219 million. In fact, there is, you know, there's no evidence to believe that. Also, there was talk about the, via Christie's, getting the carryover depreciate numbers, the book values, if a loss isn't recognized, yeah, well, that may be the truth, but it had no consequence, at least for Medicare, because that net book value did not generally play into the capital reimbursement of the hospital. So it's the opposite of what opposing counsel says. May we follow up on that? Again, and lastly, there's really no serious question as to the income approach, the way it was done. There were a few things noted in the secretary's footnote. They were also addressed in the secretary's brief, and we believe that we've addressed them, and, you know, the income approach, I would not say is a perfect approach, just like the reproduction cost is not perfect, but this one was done by the book, and nobody has shown anything other than this wasn't an income approach, as that income approach is supposed to be performed in contexts like this, nor has anybody been shown that there is a serious basis to say that the income approach is not to be used for not-for-profit hospitals. Everything in the record is to the contrary, except the program memorandum. Mr. Major, as to the, other than the cash and cash equivalents, the non-PPP assets, can the compensation be allocated to those before allocated to depreciable assets, or not, in your view? One more time, Your Honor, please. So we have the depreciable assets and the value, I'm sorry, the liabilities, and we had this exchange about whether there's anything of the liabilities, i.e., the purchase price, the assumption of liabilities that is left over to attribute to and to deem having been paid for the depreciable assets, right? And I questioned you, wasn't it the case that that payment, the assumption of liabilities, was less than the amount of non-depreciable assets that Via Christi acquired, and you took issue with that, and I'm still trying to understand the grounds for your disputing of that. And it sounds like that's partly because you're looking at the non-depreciable assets as having several subcategories. Is that right? Well, I'm looking at the total, $219 million versus $215 million. There's, you know, a little bit of difference, but they're virtually the same. Right. If they're roughly the same before we even consider depreciable assets, you're out of luck. I disagree, Your Honor. $219 million is the value of all of the assets, including depreciable assets. The $215 million is a consideration paid for all of the assets, including depreciable assets. Now, we can get down to allocation questions and how much of that $215 million is for depreciable assets, but the 219 versus 215 is total compared to total. I'm sorry. I forgot the second part of your question. No, I think I got you. Or you got me.  That's it. Thank you, Your Honor. All right. We'll take the case under advisement.
judges: Rogers, Pillard, Williams